666 A.2d 883

**William L. SMITH**

v.

**STATE of Maryland.**

No. 1989, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Nov. 1, 1995.

666

Bradford C. Peabody, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Thomas K. Clancy, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General and Stuart O. Simms, State's Attorney for Baltimore City on the brief), Baltimore, for appellee.

Submitted before CATHELL and SALMON, JJ., and JOHN J. GARRITY, Associate Judge of the Court of Appeals (Retired), Specially Assigned.

SALMON, Judge.

Appellant, William L. Smith, was convicted at a bench trial in the Circuit Court for Baltimore City of possession with intent to distribute cocaine and possession of cocaine. Appellant was sentenced to four years imprisonment for possession with intent to distribute. The possession count merged. On appeal, appellant asks whether the trial court erred in denying

his motion to suppress physical evidence. For reasons hereinafter explained, we answer that question in the affirmative and reverse.

## I. *FACTS*

The only witness who testified at the suppression hearing was Baltimore City Police Officer Sean White ("White"). His testimony was believed, in its entirety, by the trial judge. Unless otherwise indicated, all facts set forth in Part I are those testified to by White at the suppression hearing.

About 10:50 p.m. on May 22, 1994, White received a police radio broadcast. According to the tape of that broadcast, which was admitted into evidence, the dispatcher said, "I've got a group of drug dealers selling drugs and discharging their guns in the air at the corner of Mount and Presstman Streets." Shortly thereafter, the radio dispatcher advised White that the citizen who had called in the complaint said, "The person doing the discharge is wearing a striped shirt, eighteen years old, number 1 [African American] male."

The corner of Mount and Presstman Streets is near the entrance to Mountmor Court, which is a high-crime area. White regularly patrols this area and had, in the five years prior to May 22, 1994, made numerous drug and weapons arrests in Mountmor Court.

When White and several other police cruisers arrived at the corner of Mount and Presstman Streets, all was calm. White did not see anyone wearing a striped shirt. He looked, however, to his left toward the 1400 block of Mountmor Court and saw a group "of four or five" individuals standing on the curb.

The arrival of the police caused the group at the curb to disband hastily. In particular, White noted the appellant running into Mountmor Court. While running, appellant took his right hand and put an object into his rear "waistband." White could not determine the size of the object and, in fact, "could not clearly see any object at that time." White radioed other units that he had seen a suspect running into Mountmor

Court and had "observed him tuck something into the back waist area of his pants."

White drove down Mount Street "to a break which leads off Mountmor Court." Once at the break, he turned into it and drove into Mountmor Court. He made this maneuver because he knew it would enable him to intercept appellant if appellant did not change course. White next got out of his cruiser and jogged to a point where he saw appellant walking toward him. White ordered appellant to put his hands up where he could see them. Appellant complied, and as he did so, other officers approached appellant from the rear.

White then did a pat-down around the outside of appellant's waist. Although White did not feel anything under appellant's clothing when he did the pat-down, he decided to "double check" by pulling at appellant's shirt "so that [he] could see the back of [appellant's] waistband." As White pulled the shirt out, a plastic bag containing twenty ziplock bags of cocaine fell to the ground. Appellant was then placed under arrest.

Except for testimony that appellant had on a shirt, that the shirt was not striped, and that appellant wore "pants," no evidence was introduced as to how appellant was dressed at the time he was apprehended.[1] White did testify that appellant's shirt was "over the waistband," which meant, apparently, that the shirt was not tucked into appellant's pants but hung loose over the waistband of his pants.

White was an experienced and knowledgeable police officer, who was familiar with the customs and practices of drug dealers. He was also familiar with the Mountmor Court area. He had made or participated in seven hundred to eight hundred drug arrests, and of that number, fifty-five to sixty

---

1. In White's statement of charges, he wrote that appellant was wearing a blue shirt with brown shorts. No reference to the statement of charges, however, was made at the suppression hearing. At appellant's preliminary hearing, White said appellant had on "pants-shorts" but did not otherwise describe appellant's clothing. The transcript of the preliminary hearing was not provided to the motions judge.

percent of the arrestees carried guns when apprehended. In White's experience, if drugs were being sold on the street, normally the seller or a confederate would stand nearby armed with a handgun. If White, while in a marked cruiser in the Mountmor Court area, approached any group, seven out of nine times the entire group would flee.

In describing the circumstances surrounding typical street-level drug activity, White explained that it is common for an individual to yell "Five O" (slang for "police") to warn others that the police are coming. The group usually then splits up to make it more difficult for the police to observe or follow them. In White's experience, the individual who has the gun moves away from the police officer, rather than toward him.

Because of the contents of the police broadcast and appellant's actions, coupled with White's experience with drug sellers, White believed that appellant had placed a handgun in his waistband. Based on this belief, White frisked appellant.

The motions judge denied appellant's motion to suppress the cocaine that fell from appellant's waistband area. In a lengthy oral opinion, the court reviewed the "stop and frisk" case law established by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The court included in its remarks the following review:

The narrow scope of the *Terry* exception [to the warrant requirement] does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . .

Nothing in *Terry* can be understood to allow generalized cursory search for weapons or, indeed, any search whatever for anything but weapons[.] [Citation omitted]. The purpose of this limited search is not to discover evidence of crime but to allow the officer to pursue his investigation without fear of violence and thus the frisk for weapons must be equally necessary and reasonable[.] [Citation omitted].

If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed[.] [Citation omitted]

... [I]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes the identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officers search for weapons. If the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view doctrine.

Applying the above principles, the court held that White's stop of appellant was constitutionally justified:

All of the facts in their context, I find as a matter of fact and as an issue of law that that confluence of facts under those circumstances were the kind of particularized facts that could be pointed to to lead the officer to a rational conclusion ... that the individual was armed sufficient for the purpose of conducting the limited pat-down that would, in fact, be known as a frisk for weapons under those circumstances.

Those facts were that there was a call for people selling drugs who were armed, even though it only focused on the individual in the striped shirt having arms. That there was a discharge of firearms which the officers did not hear. That upon reaching the location that there was a crowd dispersing, and that this particular individual was dispersing away from the officers rather than at an angle as were the others, and that not only was that all being done, but that that individual was tucking something into the back of his waist.

And in the context of that location, that call, and those observations, the officer made the conclusion that that individual had tucked a firearm there, and I cannot say that he did not have a reasonable suspicion that what was tucked was a firearm....

The court proceeded to rule that, based on the reasonable suspicion that appellant was armed, White was entitled to conduct a "limited pat-down ... for the kind of solid object that would have the same shape, weight, density, and bulk of a

gun." Regarding the pulling out of appellant's shirt, the court stated:

> And that upon completing that very cursory, short search, that the officer did one more thing, which was to tug at the shirt to see if tugging at the shirt *would reveal the outline of a gun,* and in such tugging out of the waistband, because of the way that they were tucked, fell the contraband, which the officer immediately determined was contraband and justified the arrest.
>
> So under the circumstances that the officer had available here, I do not find that this was a situation like *Ybarra versus Illinois* where the mere presence of the person caused the officer to make the axiomatic conclusion, well, you know, anybody could be a danger to me, and I'd better search them all, nor was it like the situation in *Alfred* where the frisk was more of an afterthought after a long interrogation.
>
> That here as the escalating pieces of the puzzle were coming into the officer's mind the officer drew the inference that the individual disappearing into Mountmor Court rather than moving in the other direction was the member of the earlier referred to group that was selling drugs, that now had the gun, even though the earlier caller had talked about an individual with a striped shirt, because of what the officer observed the defendant doing, most importantly the tucking into the back of his waistband, which would be the normal place to secrete a weapon, and under those circumstances, the motion to suppress is denied.

(Emphasis added).

## II. *STANDARD OF REVIEW*

The appropriate standard of review to be here applied was set forth in *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990):

> When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal. We make the apprais-

al by reviewing the law and applying it to the peculiar facts of the particular case. *State v. Gee*, 298 Md. 565, 571, [471 A.2d 712,] *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3519, 82 L.Ed.2d 827 (1984). When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md.Rule 8–131(c). When the question of the dishonor of a constitutional right arises by the denial of a motion to suppress, the relevant facts which we consider "are limited to those produced at the suppression hearing, *see Trusty v. State*, 308 Md. 658[, 521 A.2d 749] (1987), which are most favorable to the State as the prevailing party on the motion." *Simpler v. State*, 318 Md. 311, 312 [, 568 A.2d 22] (1990).

### III. *DISCUSSION*

Appellant first argues that, under the standard set forth in *Terry, supra,* Officer White did not have sufficient reason to either stop or frisk him. Appellant further contends that, even assuming the frisk was permissible, White's search went beyond the scope of an allowable *Terry* frisk.

■ For the reasons set forth by the motions judge, which we have quoted above, we agree that Officer White's initial stop and pat-down of appellant was justified under *Terry*. The dispositive issue in this case is, however, whether the police officer who searched appellant was acting within the lawful bounds of *Terry* when he discovered the cocaine.

What the United States Court of Appeals for the First Circuit recently said in *U.S. v. Schiavo*, 29 F.3d 6, 8 (1st Cir.1994), is apposite:

"[S]earches and seizures conducted outside the judicial process, without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, —— U.S. ——, ——,

113 S.Ct. 2130, 2135, 124 L.Ed.2d 334 (1993) (internal citations and quotations omitted). One exception, recognized in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 [, 20 L.Ed.2d 889] (1968), is that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." *Id.* (internal citations and quotations omitted). Under *Terry,* an officer may also conduct a patdown search where the officer is justified in believing that the person is armed and dangerous to the officer or others. *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881. ***This protective search must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."***

(Emphasis supplied).

In *Alfred v. State,* 61 Md.App. 647, 669–70, 487 A.2d 1228 (1985), Judge Moylan, for this Court, explained the limited scope of a *Terry* frisk:

> Under the ever-present minimization requirement of the Fourth Amendment, only a pat-down of the exterior of the clothing surface is permitted. The reason for this limitation is that a pat-down is enough to reveal the presence of large and palpable weapons, such as guns, knives, blackjacks, and brass knuckles.

> In the present case, the appellant was described as wearing a pair of snugly-fitting, body-clinging cutoff jeans. Even accepting the need for an actual pat-down rather than a visual scan ... the pat-down clearly did not reveal a weapon.... The sense of touch would clearly have revealed that it was not a gun, a knife, a blackjack, brass knuckles, or any other conceivable weapon.

In *Anderson v. State,* 78 Md.App. 471, 477–78, 553 A.2d 1296 (1989), we explained the reason behind allowing only a limited search:

The reason the Fourth Amendment permits a policeman to conduct a minimal search (a frisk) of a suspect upon such a lesser predicate is the necessity of protecting from harm the life and limb of the stopping officer. The danger is that the stoppee may be armed. Because almost all weapons—guns, knives, blackjacks, brass knuckles—are hard, palpable objects, their presence may be detected by a close pat-down of the exterior of the clothing surface. Because that is all that is necessary, that is all that is permitted.

Later, the *Anderson* Court said:

The limited frisk for weapons that was held to be reasonable in the *Terry* case itself has become the model for how the police should conduct this type of limited search permitted only for this limited purpose:

"The scope of the search in this case presents no serious problem in light of these standards. Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."

*Anderson,* 78 Md.App. at 478–79, 553 A.2d 1296 (quoting *Terry,* 392 U.S. at 29–30, 88 S.Ct. at 1884).

In *Anderson,* we held that the officer's frisk went beyond that allowable under *Terry* when a police officer reached into Anderson's pocket and pulled out a wristwatch. *Id.* at 479, 553 A.2d 1296. Anderson and a confederate had allegedly robbed a man, taking, *inter alia,* jewelry. *Id.* at 475, 553 A.2d 1296. Shortly after the robbery, the two men attempted to rob a young man of his bicycle. *Id.* at 475, 553 A.2d 1296. An

officer broadcasting a lookout for the individuals involved in the attempted bike robbery was also alerted to be on the lookout for the men who had robbed the man of jewelry. *Id.* at 475, 553 A.2d 1296. The officer concluded that the same men were involved in both crimes and proceeded to a liquor store where he saw Anderson and his partner. *Id.* at 475–76, 553 A.2d 1296. Another officer, Epperson, then arrived on the scene as reinforcement and performed a "stop and frisk" of Anderson. *Id.* at 476, 553 A.2d 1296. Officer Epperson described his pat-down of Anderson saying, "I started from around the neck and moved my way down to the sides where he had a sweat jacket on and put my hands in his pocket and pulled everything out, a watch and a ring." *Id.* For the following reasons, we concluded that Officer Epperson's frisk went beyond that allowable under *Terry:*

> Had Officer Epperson patted-down Anderson's clothing and felt the contents of the pocket from the outside, that would have been legitimate. Such, however, was not the case here. We do not even reach the possibility, suggested by the State at one point in its brief, that a wrist-watch or ring might, from the outside of the clothing, have felt like a weapon, thereby justifying a further intrusion into the pocket. There was no two-step intrusion involved in this case; Officer Epperson went directly to the interior of the pocket and came forth with its contents.

*Id.* at 479, 553 A.2d 1296.

Likewise, in *Aguilar v. State*, 88 Md.App. 276, 594 A.2d 1167 (1991), we held that the scope of the frisk went beyond that allowable under *Terry* and its progeny. In *Aguilar,* a group of policemen executed a search warrant in an apartment seeking to uncover drugs and drug paraphernalia. *Id.* at 279, 594 A.2d 1167. While the police were searching, Aguilar made an uninvited entry into the apartment with a "wide-eyed look in his eyes." *Id.* at 279, 594 A.2d 1167. Aguilar explained that he was looking for "Jamie," a person whom he was unable to describe. *Id.* at 279, 594 A.2d 1167. When Aguilar did not respond to a police officer's request for identification, the officer asked Aguilar if he were armed. *Id.* at 279, 594 A.2d

1167. Aguilar "still did not reply, so the officer 'patted [Aguilar] down.' The officer did not feel anything during the pat-down, so he asked [Aguilar] again whether he was armed. [Aguilar] continued to remain silent." *Id.* at 280, 594 A.2d 1167. The officer then asked Aguilar to unbuckle his pants, but, Aguilar failed to comply. The officer then unbuckled appellant's pants, pulled his pants down, and pulled his underwear out and down, whereupon a plastic baggie that was concealed in appellant's underwear fell out. *Id.* at 280, 594 A.2d 1167. We held that, under these circumstances, the search exceeded the scope allowed under the *Terry:*

> [T]he required frisk was conducted but nothing was felt. The officer said he knew from experience that drug dealers frequently carry weapons under the clothing which cannot be felt. He pursued his search for the unfelt but suspected weapon. ***From a security point of view the officer's action was eminently logical. The problem is that no legal basis exists for justifying the officer's further intrusion.***

*Id.* at 287, 594 A.2d 1167 (emphasis added).

■ As this Court recently reaffirmed in *State v. Jones,* 103 Md.App. 548, 568–69, 653 A.2d 1040 (1995), the "limitation [on a *Terry* frisk], of course, is that the frisk must be confined to a pat-down of the exterior of the clothing surface, careful and thorough, to be sure, ***but not intruding beneath the clothing surface,*** such as into a pocket." (Emphasis added).

With all the above in mind, we turn to the facts in this case. Officer White testified that when he first saw appellant, he could not distinguish what it was that appellant had placed into his waist area, but based on the radio call and his past experience, he suspected that what he had seen appellant place in his back waistband was indeed a weapon. Officer White described the situation as he approached appellant:

> As I entered the court area and observed the defendant, he was walking in my direction. I approached him from the front for my safety. I asked him to place his hands up where I could see them. At that time I detained him. . . .

At that time I did a pat—a stop and frisk pat down for my safety in the back of his waist area where I had seen him place an object. At that time I pulled out his shirt to check under it at which time the object fell to the ground.

Later, in response to a question from the court, Officer White explained that the "object" fell out while he was "double-checking" appellant:

Your Honor, when I went up and I went to perform my stop and frisk, the shirt was over the waistband. Basically what I did is as I patted it, I pulled the shirt out just so I could see the waistband to make sure nothing was sticking out even though I patted him, like to double check, and as I tucked the shirt back to see the waistband, that's when the object fell out.

White admitted, on cross-examination from defense counsel, that he did not feel a weapon during the initial pat-down:

Q [Defense Attorney]: And you did a cursory pat-down of his belt area?

A [White]: Correct.

Q: And then you didn't find any weapon-like bulges at that time?

A: When I patted him down, I didn't. feel anything. That's what I got to the back, I just double checked and pulled his shirt back to make sure I didn't miss anything.

■ White was within the bounds of a proper *Terry* frisk when he patted-down the outer portion of the clothing that covered appellant's waist area. But, as already noted, White went one step further—he pulled back appellant's shirt. The State produced no evidence to show that, at the moment in time when White took this additional step, he continued to have reason to believe that appellant had a handgun in his waistband. He had patted the outer surface of appellant's clothing and felt nothing. Usually the sense of touch, when patting-down the exterior clothing of a suspect, is sufficient to disclose a large weapon such as a gun. *Anderson*, 78 Md.App. at 477–78, 553 A.2d 1296. "Because that is all that is necessary, that is all that is permitted." *Id.*

■ There was no showing that there was anything peculiar about the clothing appellant was wearing (such as bulk) that would make it difficult to detect a handgun by a pat down of the outside of appellant's waist area. *Compare, United States v. Mack,* 421 F.Supp. 561 (W.D.Pa.1976), *aff'd,* 568 F.2d 771 (3d Cir.1978) (suspect's clothing was bulky—search of inner clothing allowed). If there was anything about the way appellant was dressed that would justify a more intrusive search than a pat-down, then the burden was on the State to prove it. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 236 (1983) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure"). The State here failed to meet that burden.

In justifying White's pulling back of appellant's shirt after White had felt nothing, the State cites the following excerpt from *Aguilar,* 88 Md.App. at 287, 594 A.2d 1167:

The scope allowed the police is limited by the requirement that as a prerequisite to whatever search is conducted, a pat-down or frisk of the outer surface (clothing, etc.) must be made before any more intrusive search is made. As earlier observed, if the pat-down reveals a hard object which could be a weapon, a further search is allowed. But, if the frisk reveals only a soft object, or a hard object which cannot be determined to be a weapon, further search is prohibited *unless the officer either observes conduct which leads him to believe the suspect is armed and dangerous or has some other reliable basis for believing that the suspect is armed and dangerous.*

(Emphasis added).

■ The State seizes upon the emphasized portion of the above *Aguilar* excerpt and points to appellant's conduct and the other "reliable basis" for the frisk that existed *before* the pat-down for weapons occurred. The State points out that appellant's conduct (fleeing and putting an object in his waist-

band), together with White's experience with, and knowledge regarding, narcotic sales, gave him a "reasonable basis" to pull out appellant's shirt. It is quite obvious from reading in context the emphasized portion of *Aguilar* that the language was not intended to mean that, after a pat-down is completed, further search for weapons is justified every time an officer, prior to a pat-down, has either observed conduct on the suspect's part or has developed other "reasonable basis" for believing the suspect was armed and dangerous. Such an exception to the rule that *Terry* stops must be limited in scope would swallow the rule because, to perform a pat-down frisk in the first place, the officer must always observe conduct on the part of the suspect or have other reasonable basis for the belief that the suspect is armed and dangerous. Read in context, the *Aguilar* exception applies only if 1) after the pat-down begins there is some additional conduct on the part of the suspect that supports a reasonable belief (even after the outer garments have been patted-down) that the suspect is armed with a weapon, or 2) after the frisk is completed, the police officer has some other reasonable basis to believe that the suspect is armed and dangerous. The exception is here plainly inapplicable because the State failed to show that, after the pat-down of appellant's waist area was completed, White still had a reasonable basis to believe that appellant had a handgun or other weapon in his waistband.

For the foregoing reasons the court erred in overruling appellant's motion to suppress the cocaine. Therefore, appellant's conviction will be reversed.

**JUDGMENTS REVERSED; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

GARRITY, Judge, dissenting.

I respectfully dissent from the majority opinion. If a suspect, while fleeing from a police officer responding to the report of a discharge of weapons in a high crime area, is seen

to place an object that the officer believes to be a handgun into his waistband, the police officer ought to be allowed to conduct a thorough protective pat-down search of that particular area on stopping the suspect, even though a mere cursory pat-down failed to reveal the object that had been in fact tucked into a shirt-covered waistband in back of appellant's pants.

On the foundation of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, including *Aguilar v. State*, 88 Md.App. 276, 594 A.2d 1167 (1991), I would hold the motions judge's denial of appellant's motion to suppress the evidence of twenty baggies of rock cocaine, which had fallen out of appellant's waistband when the shirt covering was "tugged by Officer White," to be eminently correct. Under the circumstances known to the police officer, the scope of the protective search was, under the ambit of the Fourth Amendment, necessary and reasonable to disclose the handgun thought to have been tucked under the waistband. Not only did Officer White have a reliable basis for believing that the appellant was armed and dangerous, but the officer was engaged in the process of completing a careful and thorough protective pat-down search of the particular waistband area when the object fell to the ground.

The following colloquy between the motions judge and Officer White is most revealing:

THE COURT: And what was the purpose of the technique where you sort of tugged at the shirt or the waistband which caused something to fall out? Is that a specific kind of technique that you learned in the academy or something?

[OFFICER WHITE]: No, Your Honor, when I went up and I went to perform my stop and frisk, the shirt was over the waistband. Basically what I did is as I patted it, I pulled the shirt out just so I could see the waistband to make sure nothing was sticking out even though I patted

him, like to double check, and as I tucked [1] the shirt back to see the waistband, that's when the object fell out.

In rendering his opinion, the motions judge stated:
That upon reaching the location that there was a crowd dispersing, and that this particular individual was dispersing away from the officers rather than at an angle as were the others, and that not only was that all being done, but that that individual was tucking something into the back of his waist.

And in the context of that location, that call, and those observations, the officer made the conclusion that that individual had tucked a firearm there, and I cannot say that he did not have a reasonable suspicion that what was tucked was a firearm. Therefore, he was permitted to conduct a limited pat-down.

.    .    .    .    .

And that upon completing that very cursory, short search, that the officer did one more thing, which was to tug at the shirt *to see if tugging at the shirt would reveal the outline of a gun,* and in such tugging out of the waistband, because of the way that they were tucked, fell the contraband, which the officer immediately determined was contraband and justified the arrest. [Emphasis added.]

.    .    .    .    .

That here as the escalating pieces of the puzzle were coming into the officer's mind the officer drew the inference that the individual disappearing into Mountmor Court rather than moving in the other direction was the member of the earlier referred to group that was selling drugs, that now had the gun, even though the earlier caller had talked about an individual with a striped shirt, because of what the officer observed the defendant doing, most importantly the tucking into the back of his waistband, which would be the

---

1. ·Although neither party corrected the phonetic record, it would appear that the word "tucked" should have been "tugged," in response to the court's question.

normal place to secrete a weapon, and under those circumstances, the motion to suppress is denied.

In essence, although the motions judge found that the "very cursory, short search" had been completed, he determined that Officer White was justified, under the totality of circumstances as known to the officer, to continue the search and "tug at the shirt to see if tugging at the shirt would reveal the outline of a gun...."

When we consider the "scope" of a *Terry* frisk we are dealing with two limiting factors, its duration and its area. We have ruled that the duration of a *Terry* frisk is limited to the time it takes to effect the necessary pat-down and no longer. *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990). The rule defining the area that may be frisked is not so easily stated.

Citing *Warden v. Hayden,* 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967), the Court, in *Terry,* stated:

The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible.

The distinctions of classical 'stop and frisk' theory thus serve to direct attention from the central inquiry under the Fourth Amendment—*the reasonableness in all circumstances* of the particular governmental invasion of a citizen's personal security.

392 U.S. at 19, 88 S.Ct. at 1878 (citations omitted, emphasis added).

The *Terry* Court observed that there is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Terry,* U.S. 392 at 21, 88 S.Ct. at 1879–80 (citing *Camara v. Municipal Court,* 387 U.S. 523, 534–535, 87 S.Ct. 1727, 1733–34, 18 L.Ed.2d 930 (1967)).

The Supreme Court further counseled:

[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which,

taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must *evaluate the reasonableness of a particular search or seizure in light of the particular circumstances.* And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? [Emphasis added.]

.　　.　　.　　.　　.

When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

.　　.　　.　　.　　.

A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' search, even though it remains a serious intrusion.

.　　.　　.　　.　　.

And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry,* 392 U.S. at 21–27, 88 S.Ct. at 1879–83 (citations omitted, footnote omitted).

Based upon these principles, the Supreme Court then examined the particular conduct of the police officer "in *this* case to determine whether his search and seizure of petitioner were reasonable, both at their inception and as conducted." *Id.* at 28, 88 S.Ct. at 1883 (emphasis added). The Court then determined that the facts and circumstances detailed by the police officer warranted a belief that the petitioner was armed and presented a threat to the officer's safety.

> In focusing on the scope of the search, the Court stated: the Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing pre conditions upon its initiation.... Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation.

*Id.* at 28–29, 88 S.Ct. at 1883–84.

The Court went on to explain that it did not intend to carve in stone the particular limitations it sanctioned in *Terry* to apply to all protective searches. It stated rather,

> We need not develop at length in this case, however, the limitations which the Fourth Amendment places upon a protective seizure and search for weapons. *These limitations will have to be developed in the concrete factual circumstances of individual cases* ... The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*Id.* at 28–29, 88 S.Ct. at 1883–84 (emphasis added).

The Court then examined the scope of the police officers' search and determined "the scope of the search *in this case* presents no serious problem in light of these standards." *Id.* at 29, 88 S.Ct. at 1883–84 (emphasis added). Although the Court recognized in that particular case the officer did not

invade the petitioner's person beyond the outer surface of his clothes, it is crucially important to note that the Court *did not* hold that under other facts and circumstances, a further intrusion would not be allowed. The Court concluded:

> *Each case of this sort will, of course, have to be decided on its own facts. We merely hold today* that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his. reasonable fear for his own or other's safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1884–85 (emphasis added).

Thus, while in *Terry* the officer only needed to frisk outer clothing to find the weapon, the Supreme Court did not rule under all circumstances that an investigatory protective search must be limited to outer clothing frisks. Indeed, as in the case at bar, it is clear that such a limitation, under the particular facts and circumstances that an officer encounters, unreasonably places him or her in immediate and direct jeopardy.

In *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), a police officer had a reliable tip that an individual (Williams) seated in a nearby vehicle was carrying narcotics and had a gun at his waist. The Court examined the particular circumstances in relation to scope and held that "the policeman's action *in reaching to the spot where the gun was thought to be hidden* constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable. The loaded gun seized as a result of this intrusion

was therefore admissible at Williams' trial." *Id.* at 146, 92 S.Ct. at 1923 (emphasis added).

The Supreme Court clearly explained its previous holding in *Terry* as being "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, he may conduct a limited protective search for concealed weapons ... So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id.* at 146, 92 S.Ct. at 1923. Again, it is crucially important to realize that the Court, as in *Terry, did not limit* a protective search to a mere cursory pat-down of outer clothing when the facts and circumstances known to the officer warranted further intrusion.

In the case at bar, Officer White testified he believed the appellant had a gun because there had been a report of a recent discharge of a firearm and that the appellant had acted the way armed persons act when conducting drug security for a drug operation. Also, the officer testified that the appellant's shirt was positioned in such a way that hid the waistband and therefore he "pulled the shirt out to see the waistband to make sure nothing was sticking out even though I patted him, like to double check...."

These facts, coupled with Officer White actually seeing the appellant place an object, which he reasonably believed to be a handgun, in the back of appellant's waistband, warranted Officer White *to continue to believe that appellant might be armed.*

Indeed, these facts operate to distinguish *Aguilar.* In *Aguilar* we ruled that once a pat-down reveals that the only object the detainee has secreted under his clothing is an object that could not be a weapon, the officer must end his frisk. We did not consider whether the search was illegal on the ground that it exceeded the scope allowed by law. In the instant case, Officer White *knew* that there was some object under the

appellant's waistband, but by his *initial* frisk was unable either to see or feel the object because of the manner in which the outer clothing had been arranged. The facts known to him caused Officer White actually to continue to maintain a reliable basis to believe a weapon was present. In essence, under the circumstances of this case, because of appellant's conduct indicating the secreting of a weapon, which suspicion was not dispelled by an initial cursory pat-down, the facts known to him warranted Officer White to continue to believe that the appellant might be armed and to extend his protective search to the waistband area.

At the risk of being redundant, it is most important to realize clearly that *the Supreme. Court did not confine a weapons search to mere outer clothing if the circumstances otherwise warranted,* as expressly counseled in *Terry* and *Williams.* Indeed, there is absolutely nothing in the case law that holds that an officer must frisk a particular area only one time and in only one way. What happened here was that the officer tried first to conduct the frisk by being as unintrusive as possible. He did this by conducting a cursory frisk. When he felt nothing, even though he actually had observed the appellant put an object under his shirt and in the back of his pants, the officer knew that his cursory protective search had not been complete. He then pulled the appellant's shirt out in order to conduct a more intrusive frisk.

I see absolutely nothing wrong with proceeding this way. In effect, the officer tried to complete his protective search by being as unintrusive as possible. The majority, by ruling as it does, actually penalizes the officer for trying to give added respect to the appellant's right of privacy.

Since the United States Supreme Court and our Court of Appeals has seen fit to extend the scope of protective frisks to containers a detainee is carrying, *Lee v. State,* 311 Md. 642, 537 A.2d 235 (1988); to a car a detainee is occupying, *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); and to the house that a detainee is occupying, *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276

(1990); it seems most logical to me that, in order to secure the safety of a police officer, we should also allow the unimpeded search of a waistband when by a mere cursory frisk of outer clothing, a police officer cannot determine whether the detainee has secreted a weapon in his waistband due to an overlapping shirt. I suggest that a frisk of a detainee's interior clothing is reasonable under the Fourth Amendment where:

1. The officer first frisks the outer clothing and finds nothing;

2. The officer's reasonable belief that the detainee is armed and dangerous has not been dispelled; and

3. There is something about the detainee's clothing that has made it impossible with the exterior frisk alone to determine whether the detainee possesses a weapon.

All three of these conditions were met in this case. I would affirm the circuit court's ruling that the police officer conducted a reasonable limited intrusive search of the area where he believed a weapon to be hidden.